UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 13 CR 328 |
| | ) | |
| vs. | ) | Honorable Edmond E. Chang |
| | ) | |
| ABDELLA AHMAD TOUNISI | ) | |

**GOVERNMENT'S APPEAL OF MAGISTRATE JUDGE'S ORDER
CONCERNING DETENTION PURSUANT TO 18 U.S.C. § 3145(a)(1)**

The UNITED STATES OF AMERICA, by GARY S. SHAPIRO, United States Attorney for the Northern District of Illinois, respectfully moves this Court pursuant to 18 U.S.C. § 3145(a)(1) to vacate the magistrate judge's May 2, 2013 pretrial release order of defendant Abdella Ahmad Tounisi. In support of its motion, the government states as follows:

On May 2, 2013, the magistrate judge entered an order setting conditions of release for the defendant, who is currently in federal custody facing the charge of providing material support to a designated foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B(a)(1). Specially, the magistrate judge released the defendant on a $50,000 unsecured bond to home confinement and electronic monitoring with the defendant's father to serve as a third-party custodian.

Because no set of conditions can reasonably assure the Court that the defendant will appear for future proceedings and that the community will be safe if the defendant is released, this Court should revoke the release order entered by the magistrate judge.

## **<u>Governing Law</u>**

The United States seeks revocation of the release order pursuant to 18 U.S.C. § 3145(a)(1), which states that "[i]f a person is ordered released by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court . . . the attorney for the Government may file . . . a motion for revocation of the order or amendment of the conditions of release." 18 U.S.C. § 3145(a)(1). The Seventh Circuit has held that "[a]lthough § 3145(a)(1) speaks of 'review' by the district judge, the court may start from scratch . . .[and that a] district judge who elects to do this, however, must follow the same procedures that apply to the taking of evidence before the magistrate judge." *United States v. Torres*, 929 F.2d 291, 292 (7th Cir. 1991).

The charge defendant faces gives rise to a presumption in favor of detention. *See* 18 U.S.C. §§ 3142(e)(3)(C) and 2332b(g)(5)(B). Though rebuttable, this presumption places a burden on the defendant to produce some evidence to show that he will not constitute a danger to the public or a

2

serious risk of flight. The burden of persuasion demonstrating the need for detention nevertheless remains with the government. *See United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985).[1]

Even if the defendant presents evidence to challenge the presumption, it remains a factor to be considered by the court. *Portes*, 786 F.2d at 764; *United States v. Dominguez*, 783 F.3d 702, 707 (7th Cir. 1986) ("Use of ['rebuttable'] in this context is somewhat misleading because the rebutted presumption is not erased. Instead, it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)."). Hence, the presumption of dangerousness and risk of flight is added to the other, statutory factors that the Court must consider, including:

> (1)    the nature and circumstances of the offense charged, including whether the offense is a . . .  Federal crime of terrorism . . . ;
>
> (2)    the weight of the evidence . . .;
>
> (3)    the history and characteristics of the person . . .; and
>
> (4)    the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

---

[1] In particular, the government must demonstrate by a preponderance of the evidence that a defendant is a risk of flight or that he is a danger to the community by clear and convincing evidence. *See* 18 U.S.C. §3142(f).

## Argument

**I. The Section 3142(g) Factors Weigh in Favor of Detention**

**A. Nature and Circumstances of the Offense Charged**

Two weeks ago, the defendant attempted to board a flight to Istanbul, Turkey, with the intention of traveling to Syria and joining an Al Qaeda-sponsored terrorist organization known as Jabhat al-Nusrah.[2] The defendant's attempt join this terrorist group was the culmination of months of planning, much of which the defendant's family, including the third-party custodian, knew about. As described below, the defendant persisted in his plans despite all efforts by his parents, other relatives, and religious leaders to dissuade him from traveling overseas to engage in violent jihad.

In the months leading up to the defendant's attempt to leave the country, the defendant performed extensive online research related to martyrdom and violent jihad, such as searches for:

---

[2] Jabhat al-Nusrah is a jihadist militant group operating inside Syria. On or about December 11, 2012, the United States Department of State amended the Foreign Terrorist Organization and Executive Order 13224 designations of al-Qaida in Iraq (AQI) to include the following aliases: Jabhat al-Nusrah, al-Nusrah Front, Jabhet al-Nusra, The Victory Front, and Al-Nusrah Front for the People of the Levant. The Department of State previously designated AQI a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act on or about December 15, 2004.

- 1/19/2013: "shaykh sulayman ibn nasir al'ulwan[3] verdict permissibility martyrdom operations";

- 1/24/2013: "shahada[4] before death";

- 1/24/2013: "shaheed[5] before he dies";

- 2/14/2013: "ayman al Zawahiri"[6]; and

- 3/26/2013: "martyrdom operations."

The defendant's plans for martyrdom centered on the terrorist group Jabhat al-Nusrah, a group that has pledged allegiance to Ayman al-Zawahiri and Al Qaeda. According to a release issued by the Department of State on December 11, 2012, since November 2011, this designated terrorist organization has claimed nearly 600 terrorist attacks – ranging from more than 40 suicide attacks to small arms and improvised explosive device operations – in major city centers in Syria, leading to the death of "numerous innocent Syrians." The defendant was well aware of Jabhat al-Nusrah's violent exploits and its affiliation with Al Qaeda. He spent countless hours watching videos of Jabhat al-Nusrah suicide bombings and poured over

---

[3] Sulayman ibn Nasir Al'ulwan is an Islamic scholar from the early fifteenth century who offered a defense of martyrdom operations.

[4] "Shahada" is an Arabic word that, in this context, appears to refer to martyrdom.

[5] "Shaheed" is an Arabic word that means martyr.

[6] Ayman al-Zawahiri is the current leader of al-Qaeda.

articles about the group's ties to Al Qaeda (and even articles about its designation by the United States State Department).

As the defendant immersed himself in media and other propaganda relating to Jabhat al-Nusrah, he resolved to leave behind his life in America and join the group. To get to Syria, he decided to fly from Chicago to Istanbul, Turkey, and then travel from Istanbul to Gaziantep, Turkey, a city that lies near the border of Turkey and Syria.

Importantly, the defendant's plans to leave for Syria were no mystery to the proposed third-party custodian, the defendant's father. In a phone call from January 5, 2013, the defendant's father told the defendant's mother, "Ah . . . your son is thinking of going to Syria," and asked, "Did you take the passport from him?"[7] The defendant's mother replied, "Yes . . . I took it." The family was also aware of the defendant's fixation on engaging in a suicide operation. On January 29, 2013, the defendant's mother spoke to a relative about "not surrendering to [the defendant's] wishes." The relative remarked that she warned the defendant, "'If you go, do not think you will die a martyr, you will die like a road kill.'"

---

[7] At the May 2, 2013 detention hearing, the government provided to the judge and counsel a binder with excerpts of certain recorded phone calls. The government will deliver a copy of this binder to the Court before the hearing tomorrow.

Yet seizing the defendant's passport and urging him not to kill himself in battle did nothing to stop him. On March 1, 2013, the defendant applied for and obtained a P.O. Box in Aurora, Illinois. On that same day, he submitted a signed application for an expedited United States passport, claiming that he sought to travel to Jordan for 10-20 days on June 15, 2013. The defendant also submitted a signed "Statement Regarding a Lost or Stolen Passport" in which the defendant claimed his previous passport had been lost, when in fact it had been taken by his parents. The defendant directed that the passport be sent to his new P.O. Box.

On March 28, 2013, while performing a search for Jabhat al-Nusrah propaganda, the defendant visited English and Arabic versions of a website that purported to recruit individuals to travel to Syria and join Jabhat al-Nusrah (it was in fact maintained by the FBI). The top portion of the webpage stated, "A Call for Jihad in Syria," and depicted a photograph of an armed fighter. The website also included a purported Jabhat al-Nusrah training video, which the defendant viewed. That video depicted individuals wearing masks and fatigues, and engaging in training, such as running with firearms. The website stated, "come and join your lion brothers of Jabhat Al-

Nusra who are fighting under the true banner of Islam, come and join your brothers, the heroes of Jabhat Al-Nusra."

The defendant reached out to the website's purported recruiter, who in fact was an FBI online undercover employee ("the OCE"). The defendant and the OCE exchanged several emails, during which the defendant told the OCE that he planned to leave for Syria by traveling to Istanbul, Turkey, and then from Istanbul to Gaziantep, a Turkish city that lies near the border of Turkey and Syria. The defendant told the OCE that "if the opportunity is given to me to attain shahada [martyrdom] I will take it."

On April 10, 2013, despite having no employment or earnings, the defendant managed to buy an airline ticket for an April 19, 2013 flight from Chicago to Istanbul, which the defendant related to the OCE. At least by April 15, the defendant's family learned of the ticket. The defendant's mother asked the defendant over the phone whether he had "return[ed] that damn thing; the ticket." The defendant expressed concern that his mother was "saying that over the telephone," which led the defendant and his mother to begin speaking in code about the airline ticket, calling it a "movie ticket." The defendant's mother demanded that the defendant "take it back." A few days later, the defendant's mother talked to another family member about trying

8

to convince the defendant to "return the ticket." Their attempts to stop the defendant proved futile, just like all of the previous attempts for the past six months.

On April 18, 2013, the defendant received from the OCE a bus ticket from Istanbul to Gaziantep, where the defendant was to meet with "brothers" from Jabhat al-Nusrah who would take the defendant to a training camp. The next day, the defendant sent the OCE an email, describing what he would be wearing upon his arrival in Istanbul. The defendant noted that if failed to make it to Gaziantep, it would be because he was "arrested in the US or in Turkey."

On the evening of April 19, 2013, the defendant went to O'Hare International Airport in an attempt to travel to Istanbul, intending to join Jabhat al-Nusrah. At the airport, after proceeding through airport security and sitting down at his gate, the defendant was questioned by CBP officers, who asked the defendant about his travel. The defendant told CBP officers that he was traveling to Turkey for three and a half days to "sightsee" and did not plan to visit any other countries. When confronted about the bus ticket to Gaziantep, which the defendant had in his carry-on luggage, the

defendant claimed he simply planned to tour that city as well. Soon after the interview, the defendant was arrested.

### B.     Weight of the Evidence Against the Defendant

The evidence against the defendant is compelling. As laid out in the criminal complaint affidavit, the FBI's investigation was extensive and involved a variety of surveillance techniques. Not only were the defendant's plans captured through online and physical surveillance, all of his communications with the FBI undercover employee were recorded. The web of lies the defendant spun to obtain a new passport and avoid scrutiny from CBP officers further reveals his guilty conscience, as does his final communication to the OCE – that if he did not arrive in Gaziantep, it would be because he was arrested. The electronic surveillance, coupled with evidence that other witnesses (including family members) knew about the defendant's plan, makes this a strong case.

### C.     History and Characteristics of the Defendant

The defendant is an eighteen year old United States citizen who resided (intermittently) with his parents in Aurora. Although the defendant has no criminal history, his recent arrest hardly counts as his first encounter with law enforcement. The defendant was a close friend of an individual

named Adel Daoud, who on September 14, 2012, was arrested for attempting to detonate a bomb outside a bar in downtown Chicago. *See United States v. Daoud*, 12 CR 723. As described in the affidavit, the defendant and Daoud shared an interest in violent jihad, a topic about which the two exchanged a number of emails, phone calls, and text messages.

In July 2012, Daoud was introduced to a purported operational terrorist, but who in fact was an FBI undercover agent. Daoud met with the undercover agent on several occasions, during the course of which he selected, researched, and surveilled a target for a terrorist attack to be carried out in the Chicago area. In August 2012, Daoud shared his plans for a terrorist attack with the defendant and sought the defendant's assistance. The defendant recommended certain attack techniques, offered ideas about targeting, and researched those locations online to analyze their feasibility.

Ultimately, however, in mid-August 2012, the defendant decided against participating in the attack, in part because he believed the undercover agent was associated with law enforcement. As Daoud explained to the undercover agent, the defendant sought instead to travel overseas to engage in violent jihad (and even pinpointed the date as April 2013). Daoud opted to carry out the attack without the defendant, which led to his arrest

on September 14, 2012, after attempting to detonate a bomb outside a bar in downtown Chicago.

Hours after Daoud's arrest, the defendant was interviewed by FBI agents at his home in the presence of his parents. During the interview, the defendant initially claimed he barely knew Daoud and that he knew nothing of Daoud's plans. After FBI agents stressed the importance of telling the truth, the defendant eventually acknowledged that he had discussed with Daoud the topic of bombing concerts and nightclubs in August 2012. The defendant told FBI agents that during Ramadan he and Daoud searched for concerts and nightclubs, locations which the defendant understood to be targets of a bombing attack. The defendant said he recommended as a target a particular nightclub in Naperville, Illinois.

The defendant told FBI agents that he eventually concluded that the person whom Daoud believed to be a terrorist was in fact a "spy," meaning an FBI informant. The defendant said that he had changed his mind about placing a bomb outside a nightclub after a religious leader told him it was wrong, though the defendant said he knew that Daoud was still planning to commit a bombing attack. Finally, the defendant admitted that he contemplated traveling to Yemen to engage in jihad.

12

The defendant's involvement in a plot to detonate a bomb in Chicago reveals much about his worldview. But perhaps even more revealing is the fact that none of this deterred the defendant from attempting to travel overseas to join a terrorist group. If ever the defendant experienced a wake-up call, surely it would be when his good friend was arrested on terrorism charges for a crime the defendant helped plan. What is more, the September 14, 2012 interview made plain to the defendant (and his parents) that the FBI was aware of the defendant's conduct and interest in violent jihad. That the defendant continued to pursue this path in the face of the FBI's scrutiny speaks volumes about his history and characteristics. Neither the defendant's parents nor the FBI was able to shake the defendant from the path that led to his arrest in this case.

### D.    Nature and Seriousness of the Defendant's Danger to the Community

The defendant did not simply want to offer himself as a soldier to fight in the ranks of a terrorist militia, he wanted to die killing others, a desire he revealed not only to the purported terrorist recruiter but also to his parents. The congressional presumption of dangerousness assigned to those who wish to engage in terrorist offenses certainly applies here.

The defendant presents a danger to the community (a term that includes the worldwide community, *see United States v. Hir*, 517 F.3d 1081 (9th Cir. 2008)), if only because he withstood prolonged efforts by others to dissuade him from engaging in violent jihad. The defendant's parents (including the proposed third-party custody) knew about his desire to die a martyr in Syria and tried repeatedly to intervene, all to no avail. Nor were other members of the defendant's community able to convince him that traveling overseas for violent jihad was wrong. These facts only reinforce the presumption of dangerousness.

## II. The Defendant Fails to Rebut the Presumption Favoring Detention

The defendant has failed to provide evidence to overcome section 3142(e)'s presumption of dangerousness and risk of flight. As the Seventh Circuit explained in *Dominguez*, the presumption in section 3142 represents a congressional finding that certain groups of offenders "are likely to continue to engage in criminal conduct undeterred either by the pendency of charges against them or by the imposition of monetary bond or other release conditions." *See Dominguez*, 783 F.2d at 707. A defendant so-charged must therefore produce some evidence of their individual circumstances or characteristics to show that "what might be true in general, is not true in

14

their particular case." *Id.* (quoting *United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985).

At the detention hearing, the magistrate judge put undue weight on the recommendation of the pretrial services officer that the defendant be released. That recommendation fails to account for the presumption in this case and the evidence laid out in the affidavit (and at the detention hearing). In other words, the defendant's involvement in a plot to carry out a terrorist attack and his ability to obtain another passport, purchase a flight, and make it to O'Hare were not factored into the calculus of the pretrial services officer and, in turn, the magistrate judge. Even a lack of criminal history should carry less force when dealing with a person caught attempting to join a foreign terrorist organization and carry out a martyrdom operation. Unlike other crimes, such as drug offenses, the charged offense typically is the sort that may only be committed once.

Given his track record, the assurance of the defendant's father to call pretrial services if the defendant were to escape should ring hollow, particularly since he knew about his son's interest in violent jihad at least since September 2012 and was unable (or unwilling) to stop his own son from attempting to fly overseas and die a martyr. This defendant harbors an

15

unusually firm commitment, one that has led him to reject all others in his life and overcome all of the logistical and financial obstacles that stood between him and the terrorist organization he so desperately wanted to join. Given the defendant's unwavering commitment to join a designated terrorist organization and engage in violent jihad, and the failure of his family (and the third-party custodian) to stop him from doing so, the conditions imposed by the magistrate judge are insufficient to protect the community and ensure the defendant's appearance at court.

WHEREFORE, the United States respectfully requests that this Court overturn the decision of the magistrate judge and enter an order that the defendant be detained.

Dated: May 2, 2013

GARY S. SHAPIRO
United States Attorney


By: _s/*William Ridgway*_____
William E. Ridgway
Barry Jonas
Assistant United States Attorneys
219 S. Dearborn
Chicago, IL 60604
(312) 469-6233