UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 13 CR 328 |
| v. ) | |
| ) | Judge Samuel Der-Yeghiayan |
| ABDELLA TOUNISI ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The UNITED STATES OF AMERICA, by its attorney, JOEL R. LEVIN, Acting United States Attorney for the Northern District of Illinois, hereby respectfully submits its Sentencing Memorandum.

On May 16, 2013, defendant Abdella Tounisi was charged with attempting to provide material support, namely personnel, to a foreign terrorist organization, namely Al Qaida in Iraq, also known as Jabhat al-Nusrah, in violation of Title 18, United States Code, Section 2339B(a)(1) (Count One), and willfully making materially false statements in a matter involving international terrorism, in violation of Title 18, United States Code, Section 1001(a)(2) (Count Two). Defendant pled guilty to Count One of the indictment pursuant to a written plea agreement on August 8, 2015. Defendant is currently scheduled to be sentenced on October 19, 2017.

**I.     Factual Background**

The defendant was a close friend of Adel Daoud, who was arrested on September 14, 2012 for attempting to detonate a bomb outside a bar in downtown Chicago. *See United States v. Daoud*, 12 CR 723. Leading up to Daoud's arrest, the

defendant and Daoud shared an interest in violent jihad, a topic about which the two exchanged a number of emails, phone calls, and text messages.[1] Meanwhile, as part of an FBI investigation, in July 2012 Daoud was introduced to a purported operational terrorist, but who in fact was an FBI undercover agent. Daoud met with the undercover agent on several occasions, during the course of which he selected, researched, and surveilled a target for a terrorist attack to be carried out in the Chicago area.

In August 2012, Daoud shared his plans for a terrorist attack with the defendant and sought the defendant's assistance. The defendant recommended certain attack techniques, offered ideas about targeting including a night club that allowed the admission of teenagers, and researched those locations online to analyze their feasibility. Ultimately, however, in mid-August 2012, the defendant decided against participating in the attack. As Daoud explained to the undercover, the defendant sought instead to travel overseas to engage in violent jihad. Daoud opted to carry out the attack without the defendant.

*The FBI Interviews the Defendant in the Wake of Daoud's Arrest*

On September 14, 2012, Daoud was arrested for attempting to detonate an explosive device in downtown Chicago. Hours after Daoud's arrest, FBI agents interviewed the defendant at his residence (the defendant's parents were also present). During the interview, the defendant initially claimed he barely knew Daoud

---

[1] "Jihad" is an Arabic term meaning "struggle," referring to one's struggle on behalf of Islam. In the context of these communications, and based on later communications, the defendant and Daoud were clearly referring to a violent form of jihad.

2

and that he knew nothing of Daoud's plans. After FBI agents stressed the importance of telling the truth, the defendant eventually acknowledged that he had discussed with Daoud the topic of bombing concerts and nightclubs in August 2012. The defendant acknowledged that he and Daoud used the term "charity" as a code word for a terrorist attack. The defendant also said that he knew Daoud was meeting with someone whom Daoud believed to be a terrorist. The defendant told FBI agents that during Ramadan he and Daoud searched for concerts and nightclubs, locations which the defendant understood to be targets of a bombing attack. The defendant said he recommended as a target a particular nightclub in Naperville, Illinois. The defendant also said he eventually concluded that the person whom Daoud believed to be a terrorist was in fact a "spy," which the defendant meant to refer to an FBI informant. The defendant said that he had changed his mind about placing a bomb outside a nightclub after a religious leader told him it was wrong, though the defendant said he knew that Daoud was still planning to commit a bombing attack. Finally, the defendant admitted that he contemplated traveling to Yemen to engage in jihad.

*Defendant is Enrolled in College*

Between February 2013 and April 2013 the defendant was enrolled at the College of DuPage during which time the FBI received information from a cooperating individual who was a classmate of the defendant's. According to the individual, the defendant often skipped class and could be found in the college's computer lab where he was seen viewing, among other sites, the webpage for Turkish Airlines, presumably to plan his travel to Syria. The cooperating individual and the defendant

3

together viewed videos depicting violence to include a video of American soldiers in Iraq being attacked by a large Improvised Explosive Device (IED). The defendant, in response to the video, appeared to celebrate the attack. They also watched videos of Jabhat al-Nusrah attacks on Syrian forces during which the defendant expressed his approval.

*Defendant's Online Research*

In the months leading up to the defendant's attempt to leave the country, the defendant performed extensive online research related to martyrdom and violent jihad, such as searches for:

- 1/19/2013: "shaykh sulayman ibn nasir al'ulwan[2] verdict permissibility martyrdom operations";
- 1/24/2013: "shahada[3] before death";
- 1/24/2013: "shaheed[4] before he dies";
- 2/14/2013: "ayman al Zawahiri"[5]; and
- 3/26/2013: "martyrdom operations."

The defendant's plans for martyrdom centered on the terrorist group Jabhat al-Nusrah, a group that by then already pledged allegiance to Ayman al-Zawahiri and Al Qaeda. This designated terrorist organization has claimed hundreds of terrorist attacks—ranging from more than 40 suicide attacks to small arms and

---

[2] Sulayman ibn Nasir Al'ulwan is an Islamic scholar from the early fifteenth century who offered a defense of martyrdom operations.

[3] "Shahada" is an Arabic word that, in this context, appears to refer to martyrdom.

[4] "Shaheed" is an Arabic word that means martyr.

[5] Ayman al-Zawahiri is the current leader of al-Qaeda.

improvised explosive device operations—in major city centers in Syria, leading to the death of "numerous innocent Syrians." The defendant was well aware of Jabhat al-Nusrah's violent exploits and its affiliation with Al Qaeda. He spent countless hours watching videos of Jabhat al-Nusrah suicide bombings and poured over articles about the group's ties to Al Qaeda (and even articles about its designation by the United States State Department).

For example, between January 2013 and April 2013, the defendant viewed multiple Jabhat al-Nusrah videos, such as:

- 1/14/2013: a video titled, "Jabhat Nusra Video!," which depicts individuals purportedly fighting on behalf of Jabhat al-Nusrah, engaging in armed combat and setting off bombs;

- 2/5/2013: an article titled, "The Rise of Al Qaeda in Syria," which is dated December 6, 2012, and describes the upcoming designation by the United States of Jabhat al-Nusrah as a foreign terrorist organization;

- 2/15/2013: an article titled, "Al Qaeda's War for Syria," which describes the presence of al-Qaeda members in Syria, operating under the name "Al Nusra Front," engaging in suicide bombings and recruiting foreign fighters;

- 3/4/2013: a video titled, "Jabhat al Nusra Promo Video – Syria," which consists of a series of videos of purported members of Jabhat al-Nusrah engaging in combat;

- 3/4/2013: a video titled, "Jabhat Al-Nusra Martyrdom OP," which depicts a purported member of Jabhat al-Nusrah preparing for and carrying out a suicide bombing;

- 3/5/2013: a video titled, "Al Qaeda Uploads Video of Suicide Bomber in Front of Hospital in Damascus," which depicts an individual purportedly carrying out a suicide bombing;

- 4/3/2013: a video depicting a purported suicide bomber from Jabhat al-Nusrah carrying out a suicide bombing.

5

Likewise, during that same time period, the defendant performed a number of internet searches on these topics, such as:

- 1/9/2013: "Jabhat Al Nusra" on liveleak.com, which returned a number of articles about the group's designation as a foreign terrorist organization, such as an article titled, "US Designates Syria's Jabhat al-Nusra front a terrorist group at lighting speed";

- 1/11/2013: "providing material support what does it mean," followed by access to a Wikipedia article about the very statute that the defendant was charged with;

- 1/12/2013: "Terrorism Act 2000," followed by access to a Wikipedia article about the Terrorism Act of 2000;

- 1/14/2013: "jabhat al nusra"[6];

- 1/23/2013: "Jabhat Al-Nusra truck bomb"; and

- 4/3/2013: "jabhat al nusra martyrdom operations."

Finally, between January 2013 and March 2013, the defendant performed a number of internet searches regarding travel from the United States to Syria and the laws that govern such travel. In particular, his research focused on travel from Chicago to Istanbul, Turkey, and then from Istanbul to Gaziantep, Turkey, a city that lies near the border of Turkey and Syria.

*Defendant's Family Attempts to Prevent Him from Traveling*

Importantly, the defendant's plans to leave for Syria were no mystery to his family. In a phone call from January 5, 2013, the defendant's father told the

---

[6] The term "jabhat al nusra" was searched on many occasions from January through April 2013.

6

defendant's mother, "Ah . . . your son is thinking of going to Syria," and asked, "Did you take the passport from him?" The defendant's mother replied, "Yes . . . I took it." The family was also aware of the defendant's fixation on engaging in a suicide operation. On January 29, 2013, the defendant's mother spoke to a relative about "not surrendering to [the defendant's] wishes." The relative remarked that she warned the defendant, "If you go, do not think you will die a martyr, you will die like a road kill."

Yet seizing the defendant's passport and urging him not to kill himself in battle did nothing to stop him. He was relentless and focused on his attempt to travel. On March 1, 2013, the defendant applied for and obtained a P.O. Box in Aurora, Illinois. On that same day, he submitted a signed application for an expedited United States passport, claiming that he sought to travel to Jordan for 10-20 days on June 15, 2013. The defendant also submitted a signed "Statement Regarding a Lost or Stolen Passport" in which the defendant claimed his previous passport had been lost, when in fact it had been taken by his parents. The defendant directed that the passport be sent to his new post office box.

*Defendant Visits A Purported Jabhat al-Nusrah Website*

During the investigation, the FBI published a webpage that purported to recruit individuals to travel to Syria and join Jabhat al-Nusrah. On March 28, 2013, while performing a search for Jabhat al-Nusrah propaganda, the defendant visited English and Arabic versions of the website. The top portion of the webpage stated, "A Call for Jihad in Syria," and depicted a photograph of an armed fighter. The website also included a Jabhat al-Nusrah training video, which the defendant viewed. That

7

video depicted individuals wearing masks and fatigues, and engaging in training, such as running with firearms. The website stated, "come and join your lion brothers of Jabhat Al-Nusra who are fighting under the true banner of Islam, come and join your brothers, the heroes of Jabhat Al-Nusra."

The defendant reached out to the purported recruiter listed on the website, who unbeknownst to the defendant was an FBI employee. The two exchanged several emails, during which the defendant said that he planned to leave for Syria by travelling to Istanbul, Turkey, and then from Istanbul to Gaziantep. The defendant emphasized his willingness to die in battle, stating that "if the opportunity is given to me to attain shahada [martyrdom] I will take it."

On April 10, 2013, the defendant bought an airline ticket for an April 19, 2013 flight from Chicago to Istanbul, which the defendant related to the purported recruiter. On April 18, 2013, the defendant received from the purported recruiter a bus ticket from Istanbul to Gaziantep, where the defendant was to meet with "brothers" from Jabhat al-Nusrah who would take the defendant to a training camp. The next day, the defendant sent the purported recruiter an email describing what he would be wearing upon his arrival in Istanbul. The defendant noted that if he failed to make it to Gaziantep, it would be because he was "arrested in the US or in Turkey."

On the evening of April 19, 2013, the defendant went to O'Hare International Airport in an attempt to travel to Istanbul, intending to join Jabhat al-Nusrah. At the airport, after proceeding through airport security and sitting down at his gate,

8

the defendant was questioned by Customs and Border Protection officers, who asked the defendant about his travel. The defendant lied to the officers, telling them that he was traveling to Turkey for three and a half days to "sightsee" and that he did not plan to visit any other countries. When confronted about the bus ticket to Gaziantep, which the defendant had in his carry-on luggage, the defendant falsely claimed he planned to tour Gaziantep as well.

At the time the defendant engaged in the conduct set forth above, he knew that Jabhat al-Nusrah was a designated foreign terrorist organization and that the organization had engaged in terrorist activity in Syria and Iraq.

## II. Government's Sentencing Guidelines Calculation

### A. Offense Level

1. Pursuant to Guideline § 2M5.3(a), the base offense level is 26.

2. Pursuant to Guideline § 2M5.3(b)(1)(E), the offense level is increased by two levels because the offense involved the provision of material support with the intent, knowledge, or reason to believe that the support was to be used to commit or assist in the commission of a violent act,

3. Pursuant to Guideline § 3A1.4(a), the offense level is increased by 12 levels, because the offense is a felony that involved a federal crime of terrorism as defined in Title 18, United States Code, Section 2332b(g)(5), namely, the offense: (1) was calculated to influence or affect the conduct of government by intimidation and coercion, and to retaliate against government conduct; and (2) was a violation of Title 18, United States Code, Section 2339B.

### B. Criminal History

Although the defendant has no prior convictions, pursuant to Guideline § 3A1.4(a), his criminal history category is VI.

### C. Acceptance of Responsibility

Assuming that defendant continues to accept responsibility and does not falsely deny or frivolously contest relevant conduct that the Court determines to be true, the defendant will have accepted responsibility for his actions in a timely manner permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, pursuant to Guideline §3E1.1(a) and (b), a three-level reduction in the offense level would be appropriate.

### D. Anticipated Advisory Sentencing Guidelines Range

Pursuant to Guideline § 5G1.1(a), the Advisory Guidelines Range is capped at the statutory maximum of 180 months.

### III. Application of § 3553(a) Factors

As part of the sentencing process, the Court is to consider the factors set forth in 18 U.S.C. § 3553(a) and impose a sentence that is sufficient, but not more than necessary, to achieve the goals of sentencing. In particular, Section 3553(a) requires the Court to consider, among other factors: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (4) to afford adequate deterrence; and (5) disparities among sentences.

### A. Nature and circumstances of the offense

It goes without saying that the offense was serious. The defendant attempted to provide aid to an organization who, at the time of the offense, was a branch of Al Qaida, a terrorist organization whose mission is the destruction of the United States. From the defendant's vast research and continuous video viewing, the defendant was aware of Jabat al-Nusrah's Al Qaida affiliation and their use of terror tactics in their mission. Although Jabat al-Nusrah may not have conducted an attack against the United States, the organization still poses a threat. Terrorism expert Dr. Bruce Hoffman has called Jabat al-Nusrah "more capable than ISIS and a more dangerous long term threat."[7] James R. Clapper, the Director of National Intelligence, has called Jabat al Nusrah one of the "most capable al-Qai'da branches."[8]

Although the defendant's motivation, as he asserts, may have been to assist in the toppling of a tyrant, his conduct in achieving his goal, if successful, would have aided an enemy in the global war on terror that this country has been fighting for over 16 years. The potential to have become a tool of the organization, to have killed innocent people or even to have returned to the United States and conduct an attack at their direction, was ever present and a risk that we as United States citizens face every time a fellow citizen joins a terrorist organization.

---

[7] http://docs.house.gov/meetings/AS/AS00/20170214/105560/HHRG-115-AS00-Wstate-HoffmanP-20170214.pdf
[8] https://www.dni.gov/files/documents/2016-02-09SASC_open_threat_hearing_transcript.pdf

### B. History and characteristics of the defendant

The government recognizes that the defendant was an enrolled college student at the time of the offense, that he is supported by a loving family, as evidenced by the letters attached to his sentencing memorandum, and that he does not have any prior criminal history.

Nonetheless, the defendant, in his commission of the offense, disregarded the warning by the FBI on the night of Daoud's arrest, bypassed his family's attempt to prevent him from traveling and ignored his education.

On September 14, 2012, the FBI knocked on the defendant's door and told him that his best friend had just been arrested for attempting to detonate a car bomb in Chicago. Yet, incredibly, the defendant was not dissuaded from pursuing his plans to join a foreign terrorist organization. To that point, the defendant cites in his sentencing memorandum (dkt. no. 82, p. 16) the general deterrence effect on others caused by the mere humiliation of an arrest itself but he does not explain how the FBI's presence at his home did not deter him. For most teenagers the presence of the FBI at their doorstep would have been a wake- up call to immediately cease and desist their plans for criminal activity. But the defendant was motivated.

The defendant discusses in his sentencing memorandum (dkt. no. 82, p. 15) the strong support of his family but he blew past their support when they tried to prevent him from effectively harming himself. Nor did he care about or consider the shame and humiliation his conduct would bring upon them. Instead he demonstrated an

intense focus on his mission, thwarting obstacles his parents placed in his path in order to prevent him from traveling, because the defendant was motivated.

The defendant cites the education he is getting in prison, certainly a positive step, but he fails to mention the educational opportunity he threw away when he tried to board a plane for Syria, sacrificing his education in pursuit of his mission, because the defendant was motivated.

Finally, the defendant argues that criminal history category VI vastly overstates his criminal history (dkt. no. 82, p. 9). This point is largely irrelevant. Even if his criminal history category was I, at a guideline level of 37 the advisory guideline range (210 – 262) would still exceed the statutory maximum of 180 months.

### C. Reflect seriousness of offense, promote respect for the law, and provide just punishment

As expressed above, this is a very serious offense. As with all cases, the punishment should be just and tailored to the particular matter. The defendant's conduct, including his false statements to the FBI at O'Hare on the night of his arrest, requires a substantial sentence that will reflect the potential consequences of his actions, had the FBI not interceded.

### D. Afford adequate deterrence

The defendant sets forth several justifications to support his position that it is unlikely that he will commit this (or any) offense again. For reasons the government will address at sentencing, the government does not dispute this point.

However, the government believes general deterrence should be given great consideration by the Court in fashioning the defendant's sentence. These type of cases

often involve young adults who have an unrealistic but romanticized notion of the world. In order to save lives, theirs as well as others, a substantial period of incarceration is required to deter these young men and women in the local community from following in the defendant's footsteps.

### E. Disparities Among Sentences

The defendant points to two cases - *United States v. Khan* 14 CR 564 (N.D. Ill) and *United States v. Conley,* 14 CR 163 (D. Colo.) – in support of their position for an 84 month term of incarceration. Both cases involve individuals of a similar age, who were charged with the same offense, for the same conduct. The Court should not consider the outcomes of those cases as there are significant differences that explain the comparatively low sentences meted out in those cases.

In both cases the defendants were cooperating with the government and have provided substantial assistance in other investigations. This is a significant factor that led to the government recommending reduced sentences. Additionally, Conley had some mental health issues which appear to have been taken into consideration by the court in fashioning its sentence. In particular, the court noted "That woman is in need of psychiatric help. She's a bit of a mess."[9] Tounisi, on the other hand, is neither cooperating nor does he have any mental health issues that could have impacted his ability to fully understand his conduct.

---

9   http://www.denverpost.com/2015/01/23/arvada-teen-jihadist-wannabe-sentenced-to-four-years-in-prison/

## IV. CONCLUSION

In short, the defendant initially engaged in a plot to conduct an attack in the Chicago area, he backed away from the plot but still retained a desire to travel overseas and fight. He was interviewed by the FBI the night his friend, Adel Daoud, was arrested but that did not dissuade him from his plan. He graduated high school and enrolled in college but the prospect of higher education did not set him on the right path. Instead he used the resources the college offered him to further his plans as well as to prevent the FBI from uncovering them. His family took away his passport to prevent him from traveling so he secretly applied for a new passport, misinforming the Department of State that he had lost his old one. He directed the State Department to send the new passport to a post office box that he opened but did not disclose to his family.

The defendant would not, and could not, be deterred. It took the FBI to intercede and arrest the defendant at the airport to put an end to his plans, as well as to have saved his life.

The government requests that the Court sentence the defendant to 180 months incarceration to be followed by a significant period of supervised release.

                                                 Respectfully submitted,

                                                 JOEL R. LEVIN
                                                 Acting United States Attorney

By:    /s/ *Barry Jonas*
        BARRY JONAS
        Assistant United States Attorney
        219 South Dearborn Street, 5th Floor
        Chicago, Illinois 60604
        (312) 353-5300